UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
v.                                 )          Case No. 1:13-cr-128-HSM-SKL
                                   )
JOHNNY CALDWELL, JR.,              )
                                   )
            Defendant.             )

## REPORT & RECOMMENDATION

Before the Court is a motion to suppress and memorandum filed by Defendant Johnny

Caldwell, Jr. ("Defendant") seeking to suppress all information resulting from a vehicle stop by

police on September 13, 2013 [Docs. 117 & 118].[1]   Defendant alleges the stop was not

supported by probable cause or reasonable suspicion.   Plaintiff United States of America ("the

government") has filed a response in opposition to the motion [Doc. 143].   After an evidentiary

hearing on the motion was held June 17, 2014, the parties were allowed to file post-hearing briefs.

Defendant filed two additional briefs [Docs. 159 & 164] and the government filed one [Doc.

163].   After fully considering all of the parties' evidence and argument, I **RECOMMEND** that

Defendant's motion to suppress be **DENIED**.

## I.      FACTUAL BACKGROUND

During the evidentiary hearing, the government presented the testimony of Chattanooga

Police Department ("CPD") Officers John Patterson ("Officer Patterson") and Kelly Downs

("Officer Downs").   Defendant presented the testimony of Marc Lawrence ("Mr. Lawrence"), a

---

[1] The motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. §
636(b) [Doc. 133].

private investigator. As pertinent, testimony from the hearing will be summarized below. Two exhibits were entered into evidence during the hearing: a map of the streets involved in the traffic stop [Government's Exhibit No. 1], and the CPD incident report [Defendant's Exhibit No. 1]. After the hearing, the parties stipulated to the admission of the patrol car video recording of the traffic stop [Doc. 156, Defendant's Exhibit No. 2]. The relevant portions of the video are also summarized herein to the extent pertinent.

### A.      Officer Patterson's Direct and Cross-Examination Testimony

Officer Patterson has been with the CPD for nine years. On September 13, 2013, he was on patrol with his partner, Officer Downs. Officer Patterson was driving his marked patrol car, and Officer Downs was riding as his passenger. The officers were contacted by an agent with the Drug Enforcement Administration ("DEA"). The agent, who had been conducting surveillance in the area, informed Officer Patterson that a silver Ford F-150 truck ("F-150") was involved in what the agent thought was a drug deal. The agent named Defendant as the driver, and the agent informed Officer Patterson that Defendant had been involved in the observed drug deal.

Officer Patterson proceeded to find and follow the F-150. He saw the F-150 turn onto Campbell Street, a residential street. Officer Patterson followed the F-150, heading south on Campbell Street and then turning right onto Wisdom Street, which has a 30 mph speed limit. The F-150 was going faster than 30 mph, and radar clocked the F-150 going 40 mph. Officer Patterson activated his blue lights to pull over the F-150, which was being driven by Defendant, for exceeding the speed limit. Officer Patterson did not observe Defendant commit any traffic violations other than speeding.

Officer Patterson stopped the vehicle on Dodson Avenue, where it intersects with Wisdom Street. The narrative of the incident report states that the stop took place on Dodds Avenue, but

this was a mistake, as the stop actually took place on Dodson Avenue. When Officer Patterson approached the vehicle, he immediately smelled marijuana. Officer Patterson recognized the smell as marijuana based upon his experience as an officer. He also noticed that both Defendant and his passenger (who turned out to be Defendant's father) had their pants unzipped. Based on his experience, Officer Patterson knew that people sometimes hide drugs in their pants or underwear when stopped by police.

Defendant gave Officer Patterson a Tennessee identification card, not a driver's license. Defendant's license was suspended. Officer Patterson and Officer Downs searched Defendant, his passenger, and the F-150. The officers found cocaine, heroin, and a scale during their search. Officer Patterson did not remember if any money was found on either Defendant or his passenger. The officers did not find any marijuana in the vehicle. The cocaine with which Defendant was charged was found in the driver's seat, next to the seat belt buckle. Officer Patterson read Defendant his rights, after which Defendant stated that nothing in the car was his. Defendant's passenger claimed ownership of the contraband.

After Officer Patterson had read Defendant his rights and had placed him under arrest for driving with a suspended license and possession of cocaine, the DEA agent contacted Officer Patterson and requested that he determine Defendant's cell phone number. Officer Patterson took Defendant's cell phone and used the emergency call function to call 911. Using caller identification, the dispatcher told Officer Patterson the phone number associated with Defendant's cell phone. Officer Patterson testified he did not search the phone, as it was locked. He did not access any call logs, photographs, text messages, or any other information in the phone. Officer Patterson provided Defendant's cell phone number to the DEA agent.

Officer Patterson never issued Defendant a citation for speeding, which he said is typical in

traffic stops where he finds more significant violations, such as drug offenses. Officer Patterson prepared the incident report in this case, although the report states that it was prepared by Officer Downs. Officer Patterson prepared the report on Officer Downs's computer, and he forgot to change the reporting officer field to show his name instead of Officer Downs's name.

**B.      Mr. Lawrence's Testimony**

Mr. Lawrence is a private investigator for Defendant. Mr. Lawrence went to the area identified in the incident report as the location of the traffic stop in this case, specifically Wisdom Street. Mr. Lawrence is familiar with the portion of Wisdom Street between Campbell Street and the railroad tracks. This section of Wisdom Street is about a tenth of a mile long; it is a straightaway with a stop sign midway between Campbell Street and the railroad tracks, where Wisdom Street intersects with Curtis Street. After crossing the railroad tracks, Wisdom Street intersects with Dodson Avenue. Because of the location of the stop sign, it would not be possible to speed on this portion of Wisdom Street without running through the stop sign.

**C.      Officer Downs's Testimony**

Officer Downs is Officer Patterson's partner. She was working with Officer Patterson on September 13, 2013, the date of the traffic stop in question. She was riding along with Officer Patterson in his patrol car when he received information from the DEA. She observed the F-150 traveling at a high rate of speed and used the radar to determine it was speeding 40 mph in a 30 mph zone.

Officer Downs did not remember the name of the street they were patrolling when they first saw the F-150, but it turned onto Wisdom Street. Wisdom Street intersects Curtis Street, but the officers stopped the F-150 before it reached Curtis Street. The officers stopped the F-150 at the intersection of Dodson Avenue and Wisdom Street, which has a traffic light at the intersection.

There was no stop sign on Wisdom Street, but there is a stop sign on Curtis Street where Curtis Street intersects Wisdom Street. They stopped Defendant's vehicle at the corner of Dodson Avenue and Wisdom Street, by the Dollar General store.

After becoming confused during cross-examination, Officer Downs stated that she was unfamiliar with the area Defendant's counsel was asking about. She stated that Defendant's F-150 never made it to the intersection of Curtis Street and Dodson Avenue, because the officers stopped the vehicle prior to reaching Curtis Street. On redirect, Officer Downs testified that she had been mistaken about the name of the street on which she used radar to measure Defendant's rate of speed. She corrected herself, stating that it had actually been Wilder Street, not Wisdom Street.

After a recess (during which the parties found a map of the streets in question), Officer Downs reviewed the map, and then she testified the officers had followed Defendant's vehicle from Campbell Street to Wilder Street—not Wisdom Street—and stopped Defendant's F-150 at the intersection of Wilder Street and Dodson, which is where the Dollar General store is actually located. Campbell Street and Wisdom Street do not intersect. Officer Downs did not remember exactly where she used the radar equipment to determine that Defendant was driving 40 mph, but she knew it was on Wilder Street, which has a speed limit of 30 mph.

Officer Downs stated that Officer Patterson wrote the incident report, but she reviewed it. If she had known the report was wrong because it referenced Wisdom Street, she would have corrected it. She did not realize the error with the street name because the names of the streets are similar. Officer Downs stated that Wisdom Street runs north-south, while Wilder Street runs east-west.

### D. Officer Patterson's "Rebuttal" Testimony

Officer Patterson, who was present during the above testimony, was recalled to the stand and testified that the traffic stop actually took place on Wilder Street, not Wisdom Street. Officer Patterson explained that he was driving behind Defendant's vehicle on Campbell Street, when it turned right onto Wilder Street. Officer Patterson noted Wisdom Street and Campbell Street do not even intersect. Defendant's vehicle was stopped at 3115 Dodson Avenue, which is the address of a dollar store, possibly the Dollar General or another name brand of dollar store. Officer Patterson's incident report narrative said Dodds Avenue, but he explained that the report should have actually said Dodson Avenue (and does so state in one section). Officer Patterson referenced Wisdom Street in the narrative of his incident report instead of Wilder Street and Dodds Avenue instead of Dodson Avenue because he made a mistake and confused the street names. Officer Patterson knows the stop took place at a dollar store at the intersection of Dodson Avenue and Wilder Street. He stated that there is no dollar store located at Wisdom Street and Dodson Avenue, only residential structures.

Officer Patterson admitted that in most cases, his memory would be better when writing up the incident report immediately after an arrest than it would be months later, but in this case he thought his memory as to the street names was better during the hearing than reflected in the incident report, since he mixed up the street names while writing the incident report. Officer Patterson stated that it was usual practice to have his partner look over the incident report, but he could not remember whether Officer Downs had looked over the report in this case. Officer Patterson stated that the speed limit on Wilder Street is definitely 30 mph.

### E. Patrol Car Video

The video recording of the traffic stop contains footage of the entire traffic stop, beginning

at 11:48:24 a.m. on September 13, 2013, prior to the officers' stop of Defendant's F-150, and concluding at 12:45:20 p.m. that same day, when the officers arrive at the Hamilton County Jail with Defendant and his passenger in the backseat of the patrol car [Defendant's Exhibit No. 2].[2] The video shows footage from two camera views. The first camera provides a "dash cam" view through the windshield of the patrol car. The second camera provides a view of the backseat of the patrol car. At the bottom of the video, there are several frames providing information in addition to the two camera views. The far-left frame is labeled "GPS," and provides speed in miles per hour, latitude, and longitude. The middle frame is labeled "Radar" and has fields for "OWN" and "TGT" in miles per hour, but both of these fields contain only dashes. The far-right frame is labeled "Trigger" and appears to show when certain equipment is activated, such as microphones, lights, brakes, etc.

The beginning of the video shows the officers' patrol car turn onto a street, the name of which is not apparent in the video [*Id.* at 11:48:28]. The patrol car then accelerates to catch up to a silver F-150 [*Id.* at 11:48:29 – 11:48:50]. During the time period the patrol car is accelerating behind the F-150, the patrol car's speed reaches 50 mph according to the "GPS" frame [*Id.* at 11:48:37]. The patrol car maintains distance behind the truck for several seconds at a speed greater than 30 mph [*Id.* at 11:48:45 to 11:48:55]. When the patrol car is immediately behind the F-150, the patrol car's lights are activated according to the Trigger frame, and the audio includes the patrol car's sirens [*Id.* at 11:48:56]. The patrol car continues to follow the F-150, and Officer

_____

[2] Defendant states that the first three minutes of the video and a one-minute portion of the video beginning at 12:43:30 are the only portions of the video that are relevant here [Doc. 159 at Page ID # 437-38]. The government references a few additional portions of the video, including footage beginning at the 11:53:39 mark; beginning at the 12:03:18 mark and ending at the 12:03:53 mark; beginning at the 12:03:56 mark; beginning at the 12:08:23 mark; and beginning at the 12:26:56 mark [Doc. 163 at Page ID # 493-944]. Of the slightly less than one hour of video footage, the parties agree that only a few minutes are relevant to Defendant's motion to suppress. Only those portions of the video are discussed herein.

Downs is heard providing their location at the Dollar General store on Dodson Avenue and the F-150's license plate number to dispatch [*Id.* at 11:49:11 to 11:49:27].

The patrol car follows the F-150 into the parking lot of the Dollar General store, at which point the officers park behind the F-150, exit their patrol car, and approach the F-150 [*Id.* at 11:49:30 to 11:49:40]. Officer Patterson approaches the driver's side door and can be heard informing the driver (now identified as Defendant) that he was stopped for speeding at 40 mph down the hill in a 30 mph zone, and Officer Patterson asks for a driver's license [*Id.* at 11:49:43 to 11:49:51]. Officer Patterson asks Defendant why his pants are undone and if the zipper is broken [*Id.* at 11:49:53 to 11:50:05]. Officer Patterson states he smells marijuana and asks Defendant when he last smoked marijuana [*Id.* at 11:50:18 to 11:50:23]. Officer Patterson asks if anyone had smoked inside the truck and states he is not worried about a little bit of marijuana [*Id.* at 11:50:24 to 11:50:34]. Officer Patterson asks Defendant if he has any guns and asks for permission to search Defendant [*Id.* at 11:50:35 to 11:50:38]. Defendant appears to give consent, and Officer Patterson tells him to step out of the truck [*Id.* at 11:50:39 to 11:50:45]. Officer Patterson then searches Defendant [*Id.* at 11:50:48].

After the passenger joins Defendant at the back of the truck, the passenger touches the general area of his pants zipper [11:53:38 to 11:53:42]. Later in the video, the passenger is searched by the officers [*Id.* at 12:03:16]. The officers can be seen picking up something white from the ground next to the passenger during their search of his person [*Id.* at 12:03:18 to 12:03:50]. The passenger and Defendant are placed under arrest [*Id.* at 12:03:37 to 12:04:50]. Later in the video, Officer Patterson can be heard explaining he stopped them for speeding, and he mentions he found both occupants of the truck with their zippers down [*Id.* at 12:08:17 to 12:08:28]. A while later, Officer Patterson can be seen retrieving Defendant's cell phone from

the pocket of his pants [*Id.* at 12:26:56 to 12:27:00].

Later, when both Defendant and the passenger are being transported in the back of the patrol car, Defendant and Officer Patterson have a conversation as to the reason why he was stopped [*Id.* at 12:43:27]. Defendant asks how the officers could know he was speeding, when he was way down the hill from them [*Id.* at 12:43:27]. Officer Patterson responds that they knew he was speeding from radar [*Id.* at 12:43:33]. The passenger says they were only going 37 mph [*Id.* at 12:44:11]. Officer Patterson informs them that the speed limit was 30 mph [*Id.* at 12:44:17]. Defendant asks Officer Patterson if the dash cam works, and when Officer Patterson informs him that it does work, Defendant states that he is going to "need that and the tape" [*Id.* at 12:44:25 to 12:44:47].

## II. ANALYSIS

Defendant argues for suppression of all evidence from the stop because: (1) the officers lacked probable cause or reasonable suspicion to stop and detain Defendant's vehicle; (2) the officers lacked probable cause, reasonable suspicion, a search warrant, or an applicable exception to the warrant requirement to search Defendant's cell phone; and (3) the amount of cocaine allegedly found in Defendant's possession is irrelevant to the drug trafficking charge against him. The Court will address each of Defendant's three arguments in turn.

### A. Lack of Probable Cause or Reasonable Suspicion

The cornerstone of Defendant's argument about the stop is the Fourth Amendment to the United States Constitution, which provides, "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ."

U.S. Const. amend. IV.[3]   Stopping a vehicle and detaining its occupants is a seizure—a non-consensual, investigative detention—under the Fourth Amendment.   *United States v. Gross*, 550 F.3d 578, 582 (6th Cir. 2008).   If either the initial traffic stop or the scope and duration of the stop is unlawful, then the evidence obtained from that illegality may be excluded as "fruit of the poisonous tree."   *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).   In this case, Defendant contests the basis for the stop, not the scope or duration of the stop.

Defendant, as the proponent of the motion to suppress, generally bears the burden of establishing his Fourth Amendment rights were violated, *see Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978), but it is the government's burden to demonstrate by a preponderance of the evidence that the stop was proper, *see United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990). Evidence seized during an unlawful traffic stop must be suppressed.   *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008).

The United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation."   *Blair*, 524 F.3d at 748.   *See also Whren v. United States*, 517 U.S. 806, 810 (1996) (the decision to stop an automobile is reasonable where there is probable cause to believe a traffic violation has occurred); *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) (reasonable suspicion standard for ongoing traffic violation; probable cause standard for completed traffic violation).   Here, the government has argued the

---

[3] A defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right.   *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001).   As a preliminary matter, the government does not contest that Defendant had a legitimate expectation of privacy with respect to the arguments addressed herein.

police met the higher probable cause standard for the stop, and as a result, that is the standard applied herein.

"Probable cause is satisfied when the facts and circumstances within the officer's knowledge, based on reasonably trustworthy information, are sufficient to warrant a man of reasonable caution to believe that an offense has been or is being committed." *United States v. Bonilla*, 357 F. App'x 693, 695 (6th Cir. 2009) (citing *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005)). Probable cause deals with probabilities; it does not require evidence sufficient to establish a prima facie case that a particular law has been violated. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). The relevant inquiry is whether the facts known to the officer supported a reasonable belief that Defendant, as the driver of the car, was doing something that represented a violation of the law. *See United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010).

Defendant does not appear to dispute that the stop actually took place on Wilder Street, as shown in the video.[4] Instead, Defendant challenges whether the government met its burden to prove he was speeding. The main thrust of Defendant's argument is that the officers' testimony that the car was speeding on Wisdom Street, and the belated correction to Wilder Street as the location of the speeding, is not credible. Clearly, the officers testified inconsistently about the

---

[4] Defendant notes "there was no indication that this video even existed until after the June 17 hearing" [Doc. 159 at Page ID # 437]. Defendant, however, was aware of the existence of the video because he asked Officer Patterson about the dash cam video while he was in the backseat of the patrol car, prior to arriving at the Hamilton County Jail. Defendant's argument that the officers lacked probable cause or reasonable suspicion to stop his vehicle is supported by essentially only one sentence in his initial memorandum: "Accordingly, with the stop and detention of the vehicle in this case being unsupported by probable cause or reasonable suspicion, all evidence gained by law enforcement as a result of this encounter should be suppressed." [Doc. 118 at Page ID # 257]. In his post-hearing reply brief, however, Defendant focuses his argument on the officers' confusion regarding the names of the streets involved in the traffic stop.

name of the street where the stop took place, apparently in reliance on the carelessly written incident report. This lack of care and precision created unnecessary confusion and wasted effort to be sure, but it did not discredit the officers' testimony about their observation of Defendant's speeding violation. A court is given wide latitude in making its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002). In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic. *See United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005). I **FIND** that each officer's demeanor, descriptive account of the day's events, corroborated testimony, explanation of the noted street name inconsistencies, and overall impression support my finding that the officers gave credible testimony that Defendant was speeding.

Defendant concedes the video shows the patrol car exceeding the 30 mph speed limit considerably, but contends that this does not show Defendant's speed, as the patrol car is rapidly gaining on Defendant's vehicle. Defendant focuses on the fact that the video's radar field remains blank for the entire video, even though the officers testified that they used radar to detect Defendant's speed. Defendant also states in his reply that "Defendant acknowledged [in the video, after he was arrested, that he had] been driving 37 mph," but Defendant argues that what "Officer Patterson learned after making the stop cannot be used to justify the stop." [Doc. 159 at Page ID # 438].

As to Defendant's comment regarding the lack of radar data on the video, the government states that "the window is blank because none of the Chattanooga Police Department patrol cars are equipped with the specific radar technology that this feature uses." [Doc. 163 at Page ID # 491]. In Defendant's second post-hearing brief, he counters that the alleged fact that CPD patrol cars do not use the type of radar displayed in the video is not in the record [Doc. 164 at

Page ID # 503].   Defendant is correct that this information is not in the record, and thus it will not be relied upon herein.   However, Defendant was given an opportunity to cross-examine the officers about their use of radar equipment, and he did not discredit their testimony regarding same.

With regard to Defendant's argument about what he states to be his own acknowledgment that he was driving 37 mph, it appears that Defendant's passenger was actually the one who stated they had been driving 37 mph, not Defendant.   The government concedes that "[n]either the government nor Officer Patterson has ever pointed to this admission as a basis for justifying the stop."   [Doc. 163 at Page ID # 493].   Because the statement took place after the stop, the statement itself was not a basis for the stop, but it certainly indicates that at least the passenger of the vehicle believed the car was traveling at 37 mph, which does support the officers' claim the F-150 was speeding.

Regarding Defendant's argument that the patrol car's speed, which is displayed in the video as reaching 50 mph, cannot be used to show Defendant's speed, the government argues that a fair inference can be made that Defendant was speeding based on the patrol car's speed.   I agree with the government.   The video shows the patrol car maintaining distance behind Defendant's F-150 for several seconds during which the patrol car and thus, by inference, the F-150.

To the extent Defendant also suggests the officers' subjective intent or true purpose for the stop was unrelated to the traffic infraction, any such subjective intent or purpose is irrelevant in determining lawfulness under applicable precedent.   *See Hughes*, 606 F.3d at 315-16 (rejecting the district court's analysis as to why the officer "*really*" stopped the vehicle); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (citing *Whren v. United States*, 517 U.S. 806,

812-13 (1996)) ("[A]n officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle."); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (holding that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful"). The law is settled that an officer's subjective motivation is simply of no legal consequence when there is probable cause for the stop. Officers will often have unrelated suspicions about a traffic violator, but reviewing courts do not ask whether an officer would have made a traffic stop if not for those unrelated suspicions; they ask only whether "this particular officer in fact had probable cause to believe that a traffic offense had occurred . . . ." *Ferguson*, 8 F.3d at 391. If so, the stop is reasonable. *Id.*

Accordingly, I **FIND** that probable cause existed for the stop of Defendant's vehicle, and I therefore **RECOMMEND** that Defendant's motion to suppress be **DENIED** with respect to his arguments about the stop.

### B. Search of Defendant's Cell Phone

Defendant next argues that the officer improperly searched his cell phone during the traffic stop, and Defendant thus seeks to suppress all information taken from his phone during the stop. The government initially represented that no information was taken from Defendant's cell phone during the traffic stop and that it did not intend to introduce any information from Defendant's phone at trial [Doc. 143 at Page ID # 351, 355]. During the hearing, however, the government stated that Defendant's cell phone number was at issue and it was obtained during the stop.

As noted above, after Defendant's arrest, Officer Patterson removed Defendant's cell phone from the pocket of Defendant's pants. At the request of a DEA agent, Officer Patterson obtained the phone number of Defendant's locked phone by making an "emergency call" to 911.

The 911 dispatcher used a caller-identification feature to report the phone number associated with Defendant's cell phone to Officer Patterson, who, in turn, informed the DEA agent of Defendant's cell phone number. The government apparently intends to use the phone number in its case-in-chief.

It appears undisputed that Officer Patterson used Defendant's phone without consent or a warrant to place a call to 911 for purposes of determining the phone number associated with Defendant's cell phone. Defendant argues the government used his cell phone number to identify him as the person (whose identity had been previously unknown to police) who took part in conversations recorded through a wiretap placed on a co-defendant's telephone. Defendant argues that Officer Patterson's use of his cell phone, without his consent or a search warrant, is an unlawful search under the Supreme Court's recent decision in *Riley v. California*, 134 S.Ct. 2473 (2014). The government agrees that under *Riley*, the "police generally may not conduct a search of data on a cell phone without a warrant," but argues that suppression is inappropriate because the facts in this case are distinguishable from those in *Riley* [Doc. 163 at Page ID # 496]. The government further argues that even if the Court were to find a violation of the Fourth Amendment, the exclusionary rule should not apply under the good faith exception. Having the last word, Defendant contends any good faith exception should not apply given the government's "abysmal" track record in this case [Doc. 164 at Page ID # 504]. Specifically, Defendant argues that the officers should have made an effort to get their facts straight, testify accurately, or say they did not know if they were uncertain. Defendant states that the officers "could easily have made a trip to the area in which this occurred, reenacted their activities of September 13, and been in a position to testify accurately . . . ." [*Id.*]. Defendant argues that the officers' testimony "is at best negligent to the point of recklessness, and its reliability is suspect," which "cannot satisfy the

definition of good faith, and the exception should not apply." [*Id.* at Page ID # 505].

While "[t]he general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible[,]" *United States v. Dice*, 200 F.3d 978, 983 (6th Cir. 2000), suppression of evidence "is not an automatic consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 137 (2009), *quoted in United States v. Buford*, 632 F.3d 264, 270 (6th Cir. 2011). As held in *Buford*, "[t]he Supreme Court's jurisprudence is clear: Whether the exclusionary sanction is appropriately imposed in a particular case . . . is an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct." 632 F.3d at 275-76 (alteration in original) (citations and internal quotation marks omitted). I **FIND** the government correctly contends that even *if* placing a call to 911 without a warrant or consent was a search of the data on Defendant's cell phone and thus a violation of the Fourth Amendment, the exclusionary rule should not apply under the reasoning of cases such as *Davis v. United States*, 131 S. Ct. 2419 (2011), *Herring*, 555 U.S. 135, and *United States v. Leon*, 468 U.S. 897 (1984).

Exclusion of evidence is a "judicially created rule . . . 'designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *Herring*, 555 U.S. at 139-40 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). The exclusionary rule applies only "where its remedial objectives are thought most efficaciously served," *Arizona v. Evans*, 514 U.S. 1, 11 (1995) (citing *Leon*, 468 U.S. at 908), and "where it 'result[s] in appreciable deterrence.'" *Herring*, 555 U.S. at 141 (alteration in original) (quoting *Leon*, 468 U.S. at 909). "'[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs.'" *Herring*, 555 U.S. at 141 (alteration in original) (quoting *Illinois v. Krull*, 480 U.S. 340, 352-53 (1987)). In the end, the

decision to suppress evidence "turns on the culpability of the police and the potential of exclusion to deter wrongful police conduct."   *Herring*, 555 U.S. at 137.

On September 13, 2013, the date Officer Patterson used Defendant's cell phone, there was no binding cell phone-specific proclamation from either the Sixth Circuit or the Supreme Court to suggest that such use was a search of cell phone data in violation of the Fourth Amendment.   I conclude Supreme Court authority regarding searches of property found on an arrestee's person, such as *United States v. Robinson*, 414 U.S. 218 (1973) and its progeny, in combination with the decisions of most courts to have addressed the issue of a cell phone search incident to arrest at that time, *see United States v. Clark*, No. 1:13-cr-84-HSM-SKL, slip op. Doc. 23 at Page ID # 56-57 (E.D. Tenn. Feb. 18, 2014) (collecting cases), render the actions of Officer Patterson objectively reasonable.

In addition, the benefits of deterrence in this case do not appear to outweigh the costs to society of suppression.   In *Herring*, the Supreme Court rejected the application of the exclusionary rule where an "officer reasonably believes there is an outstanding arrest warrant, but that belief turns out to be wrong because of a negligent bookkeeping error by another police employee."   555 U.S. at 137.   Analogizing to its decisions in *Leon*, 468 U.S. at 922 (exclusionary rule inapplicable where police act in objectively reasonable reliance on a warrant issued by a neutral magistrate), and *Evans*, 514 U.S. at 14–15 (exclusionary rule inapplicable where police acted in reasonable reliance on a database which mistakenly indicated that a warrant was outstanding), the Supreme Court concluded that any deterrent effect of applying the exclusionary rule in *Herring* was outweighed by the costs to society.   *Herring*, 555 U.S. at 140-43, 147-48.

The Sixth Circuit interpreted the impact of *Herring* on Fourth Amendment violations in *United States v. Master*, 614 F.3d 236, 241-43 (6th Cir. 2010).   In *Master*, a case involving a

defective warrant, the Sixth Circuit read *Herring* as "effectively creat[ing] a balancing test by requiring that in order for a court to suppress evidence following the finding of a Fourth Amendment violation, 'the benefits of deterrence must outweigh the costs.'" *Master*, 614 F.3d at 243 (quoting *Herring*, 555 U.S. at 141). The Sixth Circuit reasoned that "the *Herring* Court's emphasis seems weighed more toward preserving evidence for use in obtaining convictions, even if illegally seized, than toward excluding evidence in order to deter police misconduct unless the officers engage in 'deliberate, reckless, or grossly negligent conduct.'" *Id.* (quoting *Herring*, 555 U.S. at 144). *See also United States v. Godfrey*, 427 F. App'x 409, 412 (6th Cir. 2011) (quoting *Master*, 614 F.3d at 243). *But see United States v. Lazar*, 604 F.3d 230, 237-38 & n.6 (6th Cir. 2010) (rejecting the idea that *Herring* had "greatly expanded" the good faith exception or had "changed the applicable standard," and finding that "*Herring* does not purport to alter that aspect of the exclusionary rule which applies to warrants that are facially deficient warrants *ab initio*").

Under *Herring*, as applied in *Master*, evidence should be suppressed "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." *Herring*, 555 U.S. at 143 (quoting *Krull*, 480 U.S. at 348-49) (internal quotation marks omitted); *accord Master*, 614 F.3d at 241-43.[5] Thus, a crucial finding needed to suppress evidence is the balance between whether police misconduct is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. The Supreme Court has often held the exclusionary rule's sole purpose is to

---

[5] It has been noted that the good faith exception may be in the process of swallowing the exclusionary rule. *Davis*, 131 S. Ct. at 2439 ("[I]f the Court means what it now says, if it would place determinative weight upon the culpability of an individual officer's conduct, and if it would apply the exclusionary rule only where a Fourth Amendment violation was 'deliberate, reckless, or grossly negligent,' then the 'good faith' exception will swallow the exclusionary rule.") (Breyer, J., dissenting).

deter future Fourth Amendment violations and has limited the rule's operation to situations in which the purpose of appreciable deterrence is achieved. *See, e.g., Davis*, 131 S. Ct. at 2426–27. Deterrent value alone, however, is insufficient for exclusion because any analysis must also "account for the 'substantial social costs' generated by the rule," since "[e]xclusion exacts a heavy toll on both the judicial system and society at large." *Id.* at 2427 (quoting *Leon*, 468 U.S. at 907). Application of the exclusionary rule to suppress evidence typically "requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," so the "bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." *Id.* at 2427. Thus, exclusion is a remedy of last resort, and the benefits of deterrence must outweigh the heavy cost of exclusion. *Id.*

Applying *Herring* and *Master*, the balance in this case favors admission of the evidence. There was no applicable cell phone-specific binding precedent that instructed Officer Patterson on the legality of searching Defendant's cell phone data (even assuming *arguendo* that Officer Patterson's actions constituted a search of Defendant's cell phone data). The uncontradicted evidence establishes that Officer Patterson acted in good faith and reasonably believed he had authority to use Defendant's cell phone to call 911 in order to determine the phone number associated with the cell phone, incident to Defendant's lawful arrest. Defendant has failed to highlight any deliberate, reckless, or grossly negligent disregard of the Fourth Amendment by law enforcement that might sway the balance to suppression. While Defendant contends the officers' inconsistent testimony months later regarding the street names involved in the traffic stop was "at best negligent to the point of recklessness, and its reliability is suspect[,]" [Doc. 164 at Page ID # 505], this ill-prepared testimony does not indicate any deliberate, reckless, or grossly negligent actions by the Officer Patterson with respect to his use of Defendant's cell phone to obtain the

phone number associated with the phone at the time of arrest.

The exclusionary rule's operation is limited to situations in which the purpose of appreciable deterrence is achieved, and this is not such a case. As exclusion is a remedy of last resort, I **FIND** the benefits of deterrence in this case would not outweigh its heavy cost. *See Davis*, 131 S. Ct at 2427. I also **FIND** suppression would not be an appropriate remedy as Officer Patterson's conduct in placing an emergency call was objectively reasonable at the time and was not a deliberate, reckless, or grossly negligent disregard for Defendant's Fourth Amendment rights. Accordingly, I **CONCLUDE** application of the good faith exception in this matter would not stretch cases such as *Davis*, *Herring*, *Buford*, and *Master* beyond the bounds of precedent or the Fourth Amendment. Under the collective reasoning of the good faith precedent discussed above, I **FIND** that a good faith exception to the exclusionary rule would apply to the phone number obtained as a result of the warrantless, non-consensual use of Defendant's cell phone, even if Officer Patterson's actions did constitute an illegal search of that phone's data. Thus, it is not necessary to determine whether Officer Patterson's actions did constitute an illegal search of that phone's data in violation of the Fourth Amendment.

Accordingly, I **RECOMMEND** that Defendant's motion to suppress be **DENIED** with respect to his arguments about the use of his cell phone to obtain his telephone number.

### C. Relevancy of the Amount of Cocaine

Defendant's final argument is that the small amount of cocaine found in the traffic stop is irrelevant to the drug trafficking charge against him. Defendant argues that even if the cocaine is "of some small relevance," it is "greatly outweighed by prejudicial effect; i.e., failing the balancing test of Rule 403, Federal Rules of Evidence." [Doc. 118 at Page ID # 258]. Defendant's argument that the small amount of cocaine is unfairly prejudicial does not touch on

the Fourth Amendment and, therefore, is not a proper argument for suppression. At the evidentiary hearing on the motion to suppress, Defendant agreed his argument as to relevancy is an evidentiary issue, rather than a suppression issue.

Accordingly, I **RECOMMEND** that Defendant's motion to suppress be **DENIED** with respect to his argument concerning this issue, although he may be able to address this issue further in a motion in limine or other proper motion.

## III. CONCLUSION

After having considered all evidence, testimony, and argument in this case, for the reasons stated above, I **RECOMMEND**[6] that Defendant's motion to suppress [Doc. 117] be **DENIED** in its entirety.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[6] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).